# United States Court of Appeals
## For the First Circuit

No. 99-1767

ATLANTIC FISH SPOTTERS ASSOCIATION, JONATHAN E. MAYHEW,
RAYNOLD F. BROOKS, II, ROBERT H. SAMPSON,

Plaintiffs, Appellees,

v.

WILLIAM M. DALEY, as he is the United States
Secretary of Commerce,

Appellant,

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Chief Judge,

Boudin and Lynch, Circuit Judges,

David C. Shilton, Department of Justice, with whom Lois J. Schiffer, Assistant Attorney General, Environment & Natural Resources Division, John A. Capin, Assistant United States Attorney, Mark A. Brown, Greer S. Goldman, Department of Justice, and Mariam McCall, National Oceanic and Atmospheric Administration, Office of General Counsel, were on brief for appellant.
   Andrew D. Herman with whom David E. Frulla, Brand & Frulla, P.C., H. Reed Witherby and Smith & Duggan were on brief for appellees.

March 6, 2000

    BOUDIN, <u>Circuit Judge</u>.  In the district court, the plaintiffs prevailed in overturning an administrative regulation and then sought attorney's fees from the United States under the Equal Access to Justice Act, 28 U.S.C. § 2412(d) ("EAJA").  The district court awarded such fees to the plaintiffs' counsel, finding (in the statutory language) that the government's position was not "substantially justified."  On this appeal by the United States, the only issue is whether the district court was entitled in computing the fees to exceed the presumptive statutory cap for attorneys fees of $125 per hour, <u>id.</u> § 2412(d)(2)(A).

    The story begins with the adoption in July 1997 of a new regulation by the Secretary of Commerce.  Under the aegis of the Atlantic Tunas Convention Act of 1975, 16 U.S.C. § 971d(a), the Secretary (acting through the National Marine Fisheries Service) prohibited the use of spotter planes by or for persons holding "general" Atlantic bluefin tuna catch permits.  62 Fed. Reg. 38,485 (1997) (codified before repeal at 50 C.F.R. § 285.31(a)(40)).  Such planes have been used for some time by some fishing vessels to spot tuna and guide boats to them.

Curiously, the regulation did not preclude the use of the planes by permit holders in the "harpoon" or "purse seine net" category. Id.

Suit was brought in the district court to challenge the regulation. The plaintiffs included a group of owners and pilots of spotter planes, their trade association, and the owners of vessels who have employed spotter planes. The district court reviewed the regulation based on the administrative record and found that the Secretary's various rationales for the regulation were unsupported and that the regulation drew distinctions inconsistent with the Secretary's rationales. Atlantic Fish Spotters Ass'n v. Daley, 8 F. Supp. 2d 113 (D. Mass. 1998).

The flavor of the arguments and the district court's treatment of them is easily conveyed. In addition to permits, the tuna catch is regulated through various quotas, and the Secretary claimed that the use of spotter planes impeded monitoring of tuna stocks by speeding up catches. By contrast, the court found that there was no apparent correlation between the use of spotter planes and the rate at which the quotas were achieved. In any event, the court could not understand why, even if spotter planes did speed up catches, their use was forbidden only for general category permit holders.

The Secretary also argued that pilots cannot successfully gauge the size of fish from the air so their efforts increased the improper harvesting of undersized tuna; the district court found that the evidence did not support this position but probably pointed in the other direction. The court also found unpersuasive the Secretary's claim that the spotter planes posed safety dangers, pointing out that this view would justify banning such planes for all categories of permit holders and not just one category. The court also noted that much of the record consisted of complaints by fishermen that plane spotting was "unfair."

At least some of these objections may have answers but the government chose not to appeal the district court's judgment. Instead, choosing to fight another day, it rescinded the old regulation, see Atlantic Tuna Fisheries; Atlantic Bluefin Tuna, 63 Fed. Reg. 36,611 (1998), and it has proposed a new and broader prohibition on spotter planes, see Atlantic Highly Migratory Species Fisheries; Atlantic Bluefin Tuna Fishery; Regulatory Adjustment, 64 Fed. Reg. 29,984 (1999), which is not now before us. The remainder of the district court case, therefore, was devoted to plaintiffs' claim that the government's position was not "substantially justified" and that the statute therefore entitled them to attorney's fees. The

-4-

application was supported by the declaration of lead counsel, David Frulla of Washington, D.C., who claimed $175 per hour for his time and that of local counsel and $150 for the time of his less experienced associate.

After further proceedings, the district court entered an order in May 1999 granting to plaintiffs attorney's fees of $55,255 plus a modest amount of other costs. The statute provides that "attorney fees shall not be awarded in excess of $125 per hour unless the court determines that . . . a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."[1] Pertinently, the district court found that because of Frulla's expertise, his time was properly billed at $175 per hour, although it reduced the hourly rate for the other two attorneys to $125.

The government now appeals. It has abandoned its earlier argument that its district court position in defense of the Secretary's regulation was substantially justified. Nor does it contest the hours claimed by any of the attorneys or the $125 per hour awarded to local counsel or Frulla's associate.

---

[1] 28 U.S.C. § 2412(d)(2)(A). Until 1996 the presumptive cap was $75 per hour, but it was raised in that year to its present level. See Contract with America Advancement Act of 1996, Pub. L. No. 104-121, § 232(b), 110 Stat. 847, 863.

Rather, it argues only--but on multiple grounds--that the district court erred in exceeding the $125 per hour cap as to Frulla's fee. Although the amount of the differential (about $12,000) is not huge, the government has a continuing interest in how the cap conditions are interpreted and applied.

On appellate review, the distinction between "interpreting" and "applying" is of some importance. A legal ruling, whether explicit or otherwise, as to the meaning of the statute is almost always an issue of law reviewed de novo; judgment calls as to how a general standard applies to a set of facts are here, as is usually but not always the case, reviewed with some deference; and findings of fact are also reviewed with deference, the usual rubric (if they are judge-made findings) being "clear error." See Massachusetts Food Ass'n v. Massachusetts Alcoholic Beverages Control Comm'n, 197 F.3d 560, 567 (1st Cir. 1999); Public Serv. Co. v. Patch, 167 F.3d 15, 22 (1st Cir. 1998).[2]

---

[2]Many courts, including the Supreme Court, sum up the standard in such attorney's fee cases by referring to abuse of discretion. Pierce v. Underwood, 487 U.S. 552, 571 (1988). But since they then treat errors of law as an example of such an abuse, see id. at 571-74; Chynoweth v. Sullivan, 920 F.2d 648, 650 (10th Cir. 1990), it seems more informative to recognize that the effective standard of review depends upon the precise claim of error being asserted and not the nature of the case.

The government's first objection is that, in the nature of things, "Frulla's 'fisheries law' experience is not the sort of practice specialty that can qualify for an enhanced fee" under the statute. This objection might at first seem only crudely related to the statutory criterion--"a special factor, such as the limited availability of qualified attorneys for the proceedings involved"--but the connection is provided by Pierce v. Underwood, 487 U.S. 552 (1988). In that case, the Supreme Court provided a gloss for the just-quoted statutory language, saying:

> the exception for 'limited availability of qualified attorneys for the proceedings involved' must refer to attorneys 'qualified for the proceedings' in some specialized sense, rather than just in their general legal competence. We think it refers to attorneys having some distinctive knowledge or specialized skill needful for the litigation in question--as opposed to an extraordinary level of the general lawyerly knowledge and ability useful in all litigation. Examples of the former would be an identifiable practice specialty such as patent law, or knowledge of foreign law or language. Where such qualifications are necessary and can be obtained only at rates in excess of the $75 cap, reimbursement above that limit is allowed.

Pierce, 487 U.S. at 572.

Building on the three examples given by the Supreme Court (patent law or foreign law or language), the government argues in effect that the limited availability test can only be

-7-

met if the lawyer has an expertise that requires some special discipline over and above the expertise that any experienced counsel might develop in his own specialty. Of course, patent law is itself a specialty, but it has its own required credentials for practice at the Patent and Trademark Office and in many (but not all) cases may involve some scientific knowledge as well. See Perales v. Casillas, 950 F.2d 1066, 1078 n.15 (5th Cir. 1992). Anyway, the government seems to think that most highly complicated bodies of technical law could never qualify.

The government cites some circuit authority that could be read in its favor,[3] while readily conceding that the Ninth Circuit has taken a more liberal view of the statute.[4] However, we do not read the Supreme Court or most of the circuit cases as adopting a mechanical rule that automatically excludes a specialist from extra compensation merely because no separate credential exists for his field and because no foreign law or

[3]See F.J. Vollmer Co. v. Magaw, 102 F.3d 591, 598 (D.C. Cir. 1996); Perales v. Casillas, 950 F.2d 1066, 1078 & n.15 (5th Cir. 1992); see also Estate of Cervin v. Commissioner, 200 F.3d 351 (5th Cir. 2000) (holding under § 7430 of the Internal Revenue Code, which has language identical to the EAJA, that to qualify for the "special factor" exception an attorney must have "nonlegal or technical abilities").

[4]See, e.g., Rueda-Menicucci v. INS, 132 F.3d 493, 496 (9th Cir. 1997) (dicta); Pirus v. Bowen, 869 F.2d 536, 541-42 (9th Cir. 1989).

language is required. Such a reading is neither compelled by the statutory language or the examples in Pierce, nor consistent with what appears to be the underlying purpose of the exception.

The statutory cap is, broadly speaking, designed to hold down the government's costs by providing modest compensation, with exceptions. As construed in Pierce, the main exception arises where "some distinctive knowledge or specialized skill [is] needful for the litigation in question," Pierce, 487 U.S. at 572 (emphasis added), and because of the "limited availability of qualified attorneys," 28 U.S.C. § 2412(d)(2)(A), it is necessary to pay more than $125 to obtain attorneys with that skill or knowledge.

So read, the statute does not assign extra compensation by "fields" but by asking the practical question whether in the case at hand lawyers qualified to handle the case can be found for $125 or less. Criminal law is hardly a simple field but CJA lawyers are paid less than $125 per hour. 18 U.S.C. § 3006A(d)(1). Still, if a plaintiff can show that a particular "fisheries law" case (or any other kind of case) requires for competent counsel someone from among a small class of specialists who are available only for $175 per hour, that seems to us enough to meet the language of the statute, its purpose, and the Supreme Court's gloss.

-9-

There is more to the government's second objection, namely, that in this case no highly rarified specialist was required. Here, a preliminary distinction is important: the question is not whether counsel's experience in fisheries law is helpful or productive but whether it is essential for competent representation. This is consistent with Congress's cost-savings objective and, equally important, with the adjectives used by Pierce itself ("needful," "necessary") to determine whether special expertise should be compensated. See also Raines v. Shalala, 44 F.3d 1355, 1361 (7th Cir. 1995) ("require," "necessary").

The district court did not explicitly find that special experience in fisheries law was "required" for competent representation in this case. The court concluded that fisheries law did represent an expertise or specialized area of practice and that Frulla (although not his two colleagues) possessed such expertise. We agree with both of the premises, but this is not by a long shot the same as a finding that such an expertise was required in this case. Nor--if such a finding is taken to be implicit--do we think that it can be supported.

Modern administrative law involves, in practically every area, a tangle of discrete regulations, various precedents, a bureaucratic vocabulary and some background

knowledge about the kinds of events commonly involved (which may, for example, be scientific, business related, or medical). It is almost always helpful for counsel to have had prior experience in the area, usually the more the better. But in most cases an otherwise competent lawyer can--albeit at the cost of some extra time--learn enough about the particular controversy to litigate in the area adequately, although perhaps not as well as a long-time specialist.

This is certainly true here. The underlying regulation was derived from notice and comment rulemaking; there was a proposed rule, written comments from the public, and a written justification of the rule, all of which comprised the record. To assess the Secretary's justifications and seek to puncture them by reasoning and publicly available data is to deploy exactly the skills taught in law school. The regulatory scheme, the data, and the analysis that led to the regulation's downfall are set forth straightforwardly in the district court's original five-page opinion.

While it not necessary to reach the government's third objection, we do so in order to be helpful to district judges in future proceedings. The government says, in substance, that even if a fisheries expert had been shown to be "necessary" to litigate this case competently, there is no finding nor any

evidence to show that lawyers so skilled were unavailable at the presumptive statutory rate of $125 per hour. We agree. Frulla's declaration did no more than confirm his extensive experience with fishery matters, describe his own "customary hourly rate" as ranging from $175 to $250 per hour, and say in conclusory terms that "there are few attorneys in the country with such a special expertise in this area."

To anyone familiar with Washington law practice, rates of $175 to $250 per hour are scarcely surprising; and regardless of the level of possible reimbursement it probably made excellent sense for plaintiffs to select an expert advocate. But in law practice, as with airline fares, deviations from the "customary" rate are legion because the lawyer's unused hours (like empty airline seats) are a perishable asset. What the declaration needed to say, with at least modest support, is that as a practical matter the plaintiffs would be unable to find a fisheries law expert for $125 (assuming arguendo that one was required).

We say "modest support" because of practical realities. No one expects the plaintiffs to conduct statistical surveys on a collateral matter like attorney's fees, and the antitrust laws do not encourage counsel to spend much time discussing fee levels with competing lawyers. But simply to say that counsel's

own customary fee bottoms out at $175 and there are not many lawyers in the country with the same expertise just does not show that exceeding the cap was necessary to procure a fisheries expert.

Whether to allow any reimbursement is a matter for Congress and so is the level of generosity.  Of course, the use of  a cap constructed in this way may be penny wise and pound foolish, since a lawyer without Frulla's experience might have to spend far more hours to do the same work, leaving the government worse off even at the lower per hour rate.  But as the statute is written and as it has been glossed by the Supreme Court, the government was entitled to oppose this request to exceed the cap and--on this record--to prevail.

The judgment is <u>vacated</u> and the matter <u>remanded</u> to recalculate the fee by reducing compensation for Frulla's time to $125 per hour.

<u>It is so ordered</u>.