# United States Court of Appeals
## For the First Circuit

---

Nos. 01-1382, 01-2273

TAMKO ROOFING PRODUCTS, INC.,

Plaintiff, Appellee,

v.

IDEAL ROOFING COMPANY, LTD.,

Defendant, Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Joseph A. DiClerico, Jr., U.S. District Judge]

---

Before

Selya, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

H. Joseph Hameline with whom Rosemary M. Allen, Geri L. Haight, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., and Michael B. Clapp were on brief for appellant.

Christopher R. Benson with whom Marcy Hogan Greer, Susan J. Hightower, and Fulbright & Jaworski L.L.P. were on brief for appellee.

March 7, 2002

**LYNCH, Circuit Judge**. Tamko Roofing Products, Inc. won its trademark infringement case against Ideal Roofing Company, Ltd. after a six-day jury trial. The district court awarded Ideal's profits to Tamko, ordered Ideal to pay Tamko's attorneys' fees, which amounted to a sum larger than the profits, and issued a permanent injunction. Ideal now appeals each of these district court actions.

We affirm. We reject Ideal's argument that bad faith or fraud is a necessary condition to an award of attorneys' fees under section 35 of the Lanham Act; willful conduct may be sufficient when the trial court takes into account all the facts and equities of the case. We reject Ideal's proposed limitation on the availability of an accounting of defendant's profits as a remedy for trademark infringement. The injunction, which covers a broader range of marks than those Tamko has registered with the United State Patent and Trademark Office (USPTO), is warranted by the "safe distance rule."

I.

The facts are described "as a jury might have found them, consistent with the record but in the light most favorable to the verdict." Grajales-Romero v. Am. Airlines, Inc., 194 F.3d 288, 292 (1st Cir. 1999).

Tamko and Ideal each manufacture and sell roofing products. Tamko manufactures and sells asphalt roofing products, including shingles, in the United States and Canada. Ideal is based in Ottawa,

Canada, and manufactures metal roofing and siding products, which it sells in Canada and the United States.

Since 1975, Tamko has been using the trademark "Heritage" in its roofing products business. By 1997, when Ideal began to use the Heritage mark, Tamko had registered ten marks in the Heritage family with the USPTO, including "The American Heritage Series" mark, and two Heritage family trademarks in Canada. Tamko has vigorously defended the Heritage marks, and has successfully enforced its trademark rights.[1]

In April 1997, Ideal selected the trademark "Heritage Series" for hidden fastener metal roofing panels, a new product it introduced to the market later that year. Ideal's "Heritage Series" mark used very similar cursive script to Tamko's "The American Heritage Series" mark. Ideal made the selection through a four-member executive committee: Marcel Laplante (President), René Laplante (Vice President), Pierre Tessier (Sales Manager), and Mark Lebreque (Quebec City Office Manager).

Before Ideal adopted the Heritage Series mark, Tessier attended several roofing trade shows where Tamko prominently displayed its Heritage mark. Ideal hired an advertising agency, Innovacom, to

---

[1] For example, Tamko has been involved in disputes over the Heritage mark with MBCI, a metal roofing manufacturer, and Supradur, Inc., a slate roofing manufacturer. In both cases, the companies acknowledged that the rights to the Heritage mark used for roofing products belonged to Tamko.

help in the selection and marketing of the new mark. Although the agency usually recommends a trademark search to its clients before they adopt a new mark, René Laplante of Ideal decided against conducting such a search through the agency, an attorney, or Ideal itself. Two other trademarks considered by Ideal were "Carriage" and "Royal Albert," both of which are similar to marks owned by other manufacturers in the roofing industry: Certain-Teed uses the mark "Carriage House," and IKO uses "Royal Victorian."

Although Tamko and Ideal produce and sell different types of roofing products, their products -- asphalt and metal roofing respectively -- are both appropriate for steep-slope roofs. They compete directly in the roofing industry market, particularly in the northeastern United States. For example, Ideal belongs to the Metal Roofing Alliance, which, among other things, attempts to persuade homeowners to install metal roofing instead of asphalt shingles. Ideal also tried to persuade consumers to use metal roofing rather than asphalt shingles in its brochure called "The Smartest Looking House."

When Tamko discovered that Ideal was using the Heritage mark for its new product line, its president, David Humphreys, wrote to Marcel Laplante on March 9, 1999. In the letter, Humphreys discussed the importance of the mark to Tamko, expressed his concern that Ideal's use of the mark would cause "confusion in the marketplace," and asked Ideal to "cease and desist all use of HERITAGE in connection with its

-4-

building products."  When Humphreys did not receive a response, he sent another letter to Ideal on March 26, 1999, demanding a response and warning Ideal that if Tamko did not receive a response, it would have "no choice but to seek legal help to resolve this matter."  Ideal responded to the second letter, but the companies could not negotiate a mutually agreeable phase out period in which Ideal would stop using the Heritage mark.  Ideal wanted a two-year period, while Tamko claimed that a few months would be sufficient.

Tamko gave Ideal notice that it was going to file a suit against it, and that the USPTO had previously rejected another metal roofing manufacturer's application for the Heritage mark.   In response, Ideal suggested a one-year phase out as a compromise.

In August 1999, Tamko filed suit against Ideal for trademark infringement in violation of section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a) (2000).[2] On November 3, 1999, Tamko filed a motion for a preliminary injunction to enjoin Ideal from using the Heritage mark until the trial resolved the infringement issue.  The district court granted the preliminary injunction on February 29, 2000, adopting the report and recommendation from the magistrate judge, who was briefed and held an evidentiary hearing on the issue.

---

[2]     Originally, Tamko had two other claims against Ideal: unfair competition under 15 U.S.C. § 1125(a) (2000), and trademark dilution under 15 U.S.C. § 1125(c) (2000).   Tamko dropped these claims before the start of the trial.

Despite the preliminary injunction, Ideal continued to use the Heritage mark in its brochures and on its web site. Ideal distributed brochures containing the Heritage mark at two trade shows which took place in March 2000 in the United States. Ideal also did not modify its web site which contained several references to the Heritage mark. As a result, on March 16, 2000, Tamko moved for contempt. After a hearing, the magistrate judge issued another report and recommendation that "Ideal should be held in contempt," finding Ideal distributed brochures that contained the Heritage mark at a trade show two weeks after the preliminary injunction issued, and "intentionally kept the 'Heritage' mark on its web site" after the injunction issued. The district court adopted the magistrate judge's report and recommendation and held Ideal in contempt on May 26, 2000. The contempt order provided that Ideal would be fined $200 for each day of noncompliance, starting on May 29, 2000. Ideal was fined $3,000 for its failure to comply with the contempt order until June 13, 2000.

In advance of trial, Ideal filed a motion in limine to preclude Tamko "from making reference in the presence of the jury to the Preliminary Injunction Order issued in this case." The issue was resolved by an agreement to a stipulated instruction to the jury. The instruction given to the jury at the start of the trial on May 16, 2000, was "after this case was filed in this court and pending the

-6-

outcome of the case, the Court on February [2]9,[3] the year 2000, ordered Ideal to stop using the trademark in question in order to preserve the status quo pending the outcome of the case."

On the fourth day of trial, during the cross-examination of René Laplante, Ideal's attorney questioned Laplante about "the Court's order" and whether it made "any mention of the Internet site?" In response, during redirect, Tamko's attorney asked Laplante about the "magistrate's report" which said that "[Ideal's] use of Heritage Series in connection with the Internet is a violation of [the] order." Ideal's attorney objected to this line of questioning.

On the fifth day of the trial, Ideal moved for a mistrial. Ideal argued that the introduction of testimony about both the preliminary injunction and the contempt order prejudiced the jury and deprived Ideal of a fair trial. The district court denied the motion, stating that Ideal had opened the door to the evidence about the contempt order, and that a jury would not understand the significance of a preliminary injunction in any case.

At the end of the trial, the district court ruled that Tamko's Heritage trademarks were valid. The jury found: (i) "by a preponderance of the evidence that Ideal infringed Tamko's trademarks"; (ii) "by clear and convincing evidence that Ideal acted willfully in

---

[3]    The court made an error in the date of the preliminary injunction and corrected itself immediately.

infringing Tamko's trademarks"; and (iii) "by a preponderance of the evidence that the roofing product[s] of Ideal and Tamko directly competed with each other."

After the close of the trial, the judge requested briefing on the issues of an accounting of defendant's profits and attorneys' fees. On August 21, 2000, the district court issued an order that Tamko was entitled to both an accounting of Ideal's profits and attorneys' fees. On October 19, 2000, the court issued an order awarding $201,385.60 in profits. On August 30, 2000, the district court permanently enjoined Ideal from "using the term Heritage, Heritage Series, H Series, or any name or mark confusingly similar to Heritage."

On appeal, Ideal is represented by new counsel. It does not contest the jury's findings, but disputes the district court's rulings. Ideal argues, first, that Tamko should not have been awarded attorneys' fees because there was no evidence to support the court's findings that "exceptional circumstances" existed. In the alternative, Ideal argues that even if attorneys' fees were justified, the district court erred in calculating the fees. Second, Ideal argues that the district court should not have awarded Tamko an accounting of 100% of Ideal's profits because the two companies did not compete in 100% of their markets, and that the court erred in setting the amount of profits. Third, Ideal contends that the district court erred in denying its motion for a

mistrial based on the prejudicial admission of testimony about the preliminary injunction and contempt order against Ideal. Fourth, Ideal argues that the scope of the district court's permanent injunction was too broad in that it enjoined it from using the term "H Series," which is not one of Tamko's registered trademarks.

## II.

A.      Ideal's Challenges to the Award of Attorneys' Fees to Tamko

The district court awarded over $500,000 in attorneys' fees and expenses to Tamko. Ideal protests that no fees at all should have been awarded since this was not an "exceptional case," a requirement under section 35 of the Lanham Act, 15 U.S.C. § 1117(a) (2000), for an attorneys' fees award. The district court erred, Ideal says, by using an incorrect legal standard to determine exceptional circumstances and by concluding that the evidence supported such an award. The court's error of law, Ideal argues, is that fees may only be awarded in circumstances where the defendant acted deceitfully or with a degree of culpability; it claims the court's error of fact is that there was no such deceit or culpability here. Finally, Ideal argues that even if some award of attorneys' fees was justified, the sum awarded is too high.

We review de novo the legal question of the meaning of "exceptional cases" in the context of section 35 of the Lanham Act. See Atl. Fish Spotters Ass'n v. Daley, 205 F.3d 488, 490 (1st Cir. 2000) ("A legal ruling . . . as to the meaning of the statute is almost always an issue of law reviewed de novo."). We review the district court's award of attorneys' fees under section 35 of the Lanham Act for abuse of discretion.[4]  To the

_____

[4]     Although this court has not articulated before the standard of review for the award of attorneys' fees in the Lanham Act context, we use the abuse of discretion standard in reviewing an award of attorneys' fees in several other contexts. See, e.g., Gay Officers Action League v. Puerto Rico, 247 F.3d 288, 292 (1st Cir. 2001) (Civil Rights Act, 42 U.S.C. § 1988); O'Rourke v. City of Providence, 235 F.3d 713, 737 (1st Cir. 2001) (Title VII);  Colortronic Reinhard & Co. v. Plastic Controls, Inc., 668 F.2d 1, 7-8 (1st Cir. 1981) (similar attorneys' fees provision of Patent Act, 35 U.S.C. § 285); see also Dubois v. United States Dep't of Agric., 270 F.3d 77, 80 (1st Cir. 2001).  Several other circuits also use the abuse of discretion standard in reviewing the award of attorneys' fees under the Lanham Act.  See, e.g., Waco Int'l, Inc. v. KHK Scaffolding Houston Inc., 278 F.3d 523, 529 (5th Cir. 2002); People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001); Securacomm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 279 (3d Cir. 2000).  But see S Indus., Inc. v. Centra 2000, Inc., 249 F.3d 625, 627 (7th Cir. 2001) ("We review a grant of attorney fees to a prevailing defendant under the Lanham Act only for clear error.").  The widespread use of this standard for awards of attorneys' fees "reflects the fact that only the district court has the 'intimate knowledge of the nuances of the underlying case,'" Richardson v. Miller, No. 01-1309, 2002 WL 91406, at *2 (1st Cir. Jan 29, 2002) (quoting Gay Officers Action League, 247 F.3d

extent that the district court's award rests on factual determinations, however, we review those for clear error. See Pierce v. Underwood, 487 U.S. 552, 557-58 (1988); De Allende v. Baker, 891 F.2d 7, 11 (1st Cir. 1989); see also People for the Ethical Treatment of Animals v. Doughney, 263 F.3d 359, 370 (4th Cir. 2001). As noted in Atlantic Fish Spotters,

> [m]any courts, including the Supreme Court, sum up the standard in . . . attorney's fee cases by referring to abuse of discretion. But since they then treat errors of law as an example of such an abuse, it seems more informative to recognize that the effective standard of review depends upon the precise claim of error being asserted and not the nature of the case.

205 F.3d at 491 n.2 (citations omitted).

1.      The Standard for Exceptional Cases

The Lanham Act provides: "The court in exceptional cases may award reasonable attorneys fees to the prevailing party." 15 U.S.C. § 1117(a). Ideal asserts that the district court erred by essentially converting the jury finding of willful infringement, without more, into a court finding of

---

at 292), and in "determining whether sanctions are warranted 'the district court is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard,'" Dubois, 270 F.3d at 80 (citing Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402 (1990)).

-11-

exceptional circumstances justifying a fee award. In truth, the district court referred to both the jury finding of willfulness and to other record evidence before it, so there was no automatic conversion of a jury willfulness finding into a finding of exceptional circumstances.[5] The district court said nothing one way or the other as to whether there was bad faith or fraud on Ideal's part.

Under the statute, the decision to award fees is committed to the district court, not the jury. 5 J. T. McCarthy, McCarthy on Trademarks and Unfair Competition § 30:99, at 30-184 (4th ed. 2001). Ideal says that the trial court failed to make the necessary findings.[6] Where the facts of record amply explain

_____

[5] To the extent Ideal argues that it would be error for a district court to adopt a per se equivalence between "exceptional case" and a jury finding of willfulness, we would agree. Congress gave the attorneys' fees issue to the court, not to the jury, and the court must consider whether an award is equitable. However, here the court did decide the issue of whether this was an "exceptional case."

[6] Ideal relies on two cases in its claim that the lack of more explicit findings by the district court was an abuse of discretion which invalidates the fee award in this case. However, in both Bandag, Inc. v. Al Bolser's Tire Stores, Inc., 750 F.2d 903, 921 (Fed. Cir. 1984), and Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 48 (3d Cir. 1991), the courts relied not only on the lack of any express findings by the district court, but also on the lack of clear facts from the

the decision, we will not find that the mere failure of the trial judge to be more explicit amounts to an abuse of discretion. See L.E.A. Dynatech, Inc. v. Allina, 49 F.3d 1527, 1531 (Fed. Cir. 1995) ("Although the district court did not state the specific basis for its fee award, sufficient record evidence supports the award.").

Because the Lanham Act does not further explain the term "exceptional cases," this court and others have turned to the legislative history for a working definition. See Volkswagenwerk Aktiengesellschaft v. Wheeler, 814 F.2d 812, 821 (1st Cir. 1987); see also Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 47 (3d Cir. 1991); VIP Foods, Inc. v. Vulcan Pet, Inc., 675 F.2d 1106, 1107 (10th Cir. 1982). In exceptional cases, attorneys' fees may be appropriate in circumstances where the acts of infringement were "'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" S. Rep. 93-1400, at 5 (1974), reprinted in 1974 U.S.C.C.A.N. 7132, 7133. The legislative history also explains that attorneys' fees may be awarded "when equitable considerations justify such awards," id. at 6,

---

record that showed exceptional circumstances. That is not the case here.

-13-

reprinted in 1974 U.S.C.C.A.N. at 7137, and so the list of four (for example, "malicious") may not be exclusive.

Ideal urges this court to adopt the "bad faith" standard utilized by some circuits. See Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996) (reciting Second Circuit rule requiring a showing of fraud or bad faith on the part of the infringer); Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc., 951 F.2d 684, 697 (5th Cir. 1992) ("requir[ing] a showing of a high degree of culpability on the part of the infringer, for example, bad faith or fraud"); Scotch Whisky Ass'n v. Majestic Distilling Co., 958 F.2d 594, 599 (4th Cir. 1991) ("It is clear . . . that for a prevailing plaintiff to succeed in a request for attorney fees, she must show that the defendant acted in bad faith."). Other circuits hold that willfulness alone is an adequate basis for the award of attorneys' fees. Bishop v. Equinox Int'l Corp., 154 F.3d 1220, 1224 (10th Cir. 1998) ("deliberate or willful" conduct on part of defendant in "fail[ing] to cease and desist from use of [the trademark] despite its written commitment to do so" was enough to warrant award of attorneys' fees); Hartman v. Hallmark Cards, Inc., 833 F.2d 117, 123 (8th Cir. 1987) ("Bad faith is not a

-14-

prerequisite to a Lanham Act fee award."). While conceding that an award may be made if the acts of infringement are willful, Ideal argues that "willful" must mean more than just voluntary and intentional. Ideal grafts on another requirement that the infringing act must be fraudulent or malicious; for example, the act must be done with an intent to deceive or confuse the public, by palming off inferior goods as though they were trademark holder's goods, or through "deliberate pirating."

Ideal's argument confuses sufficient conditions for an attorneys' fees award with necessary conditions for such an award. Fraud or bad faith may justify an attorneys' fees award in some cases,[7] but a finding of bad faith or fraud is not a necessary precondition. Willfulness short of bad faith or fraud will suffice when equitable considerations justify an award and the district court supportably finds the case exceptional. There are two reasons we reject a bad faith or fraud requirement as a precondition to an award of attorneys' fees. First, the legislative history of section 35 links such exceptional cases

---

[7] Nonetheless, it is also possible that a finding of bad faith by one party might not justify an award if equity required otherwise: for example, in a case where there is equivalent bad faith by the other party.

-15-

to situations where the acts are malicious or fraudulent or deliberate or willful, and where equity justifies the award. Congress's list does not stop with "malicious" or "fraudulent," and we are loath to strip "deliberate" and "willful" of meaning. Second, the purpose of the attorneys' fees amendment to the Lanham Act was to provide for an award in exceptional cases in which equity called for an award in the sound discretion of the district judge. We would be hard pressed to say that such a case can never arise unless there is fraud or bad faith. As an example, one circuit has approved an award of fees in a case where there was no bad faith in the infringement but the subsequent litigation was oppressive and meant to delay. See Securacomm Consulting, Inc. v. Securacom Inc., 224 F.3d 273, 279-83 (3d Cir. 2000).[8]

---

[8]    Although this court has never held that bad faith is a requirement for an award of attorneys' fees under the Lanham Act and now rejects the notion, language in some of our cases about award of fees under the Patent Act, 35 U.S.C. § 285, refers to the need for "strong evidence of unfairness and bad faith," Colotronic Reinhard & Co. v. Plastic Controls, Inc., 668 F.2d 1, 8 (1st Cir. 1981), in the context of determining whether the losing party has engaged in "inequitable conduct," Codex Corp. v. Milgo Elec. Corp., 717 F.2d 622, 630 (1st Cir. 1983).  The language of the two acts is identical; what is different is that here we have the benefit of the Lanham Act's legislative history.

Still, awards may be made only in exceptional cases. In Volkswagenwerk, this court reversed an award where the plaintiff did not plead attorneys' fees in its complaint, defendant had no statutory constructive notice of plaintiff's claim of ownership of the marks because neither the trade name nor design mark were registered, and it would have been inequitable to visit an award on the defendant's small local automobile shop. 814 F.2d at 821. Other circuits have identified as counseling against an award the following factors: the area of law is unclear and defendants might reasonably think they did not infringe, Ferrero U.S.A., 952 F.2d at 49; there is a close legal question as to whether there is any trademark violation, Martin's Herend Imps., Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 1305 (5th Cir. 1997); Ferrero U.S.A., 952 F.2d at 49; defendant had no intent to deceive or confuse the public, VIP Foods, 675 F.2d at 1107; the defendant made a concerted effort to create a non-infringing mark, Roulo v. Russ Berrie & Co., 886 F.2d 931, 942 (7th Cir. 1989); the plaintiff suffered no actual damage, Bishop, 154 F.3d at 1224; VIP Foods, 675 F.2d at 1107. We agree that these are factors to be considered as part of a case-specific multi-factored analysis.

-17-

Here, there was adequate evidence of exceptional, willful behavior, both in the infringing acts and in Ideal's conduct after Tamko brought the infringement to Ideal's attention. We outline just some of the pertinent conduct.

1. Within several days of a 1997 trade show attended by Ideal, where Tamko's Heritage Mark was prominently displayed, Ideal adopted the Heritage name and told its advertising agency not to do a trademark search, which is usually done. Neither Ideal nor its patent attorney did a trademark search.

2. The other two names considered by Ideal for its new product were substantially similar to marks owned by other companies.

3. Ideal used an elaborate cursive script for its "Heritage Series" mark, very similar to the one used in Tamko's mark "The American Heritage Series" (which was displayed in a 1996 Tamko brochure).

4. Ideal's metal roofing competes directly with Tamko's asphalt roofing for steep-slope roofs and Ideal tried to increase its market in the residential marketplace, which is asphalt's primary market.

5. Ideal did not respond to the March 9, 1999 letter from Tamko, which notified Ideal of its infringement. Tamko sent

-18-

another letter on March 26, 1999. Ideal responded and suggested a lengthy two-year phase out. When Tamko informed Ideal that the USPTO rejected a trademark application for Heritage for another company's metal roofing panels, Ideal still refused to stop its use of the mark.

6. Before filing suit, Tamko gave Ideal notice on August 17, 1999; Ideal asked for a one-year phase out.

7. In August 1999, Ideal nonetheless reprinted one of its brochures that continued the use of the Heritage Series name.

8. On February 29, 2000, the district court issued a preliminary injunction against Ideal, enjoining it from further use of the mark.

9. Nonetheless, Ideal used the brochures containing the mark in a trade show in mid-March 2000, after the preliminary injunction had issued against it.

10. Despite the preliminary injunction, Ideal continued to use the mark on its web site, which was accessed by users in the United States.

11. On May 15, 2000, the magistrate judge issued a report and recommendation, which found that Ideal was in contempt for violation of the preliminary injunction. The district court

adopted the report and recommendation and held Ideal in contempt on May 26, 2000.

12. Ideal did not come into compliance with the preliminary injunction until June 13, 2000; in the course of its noncompliance it incurred fines of $3,000.

It is the totality of the circumstances, rather than a particular item alone, that suffices for an award of attorneys' fees. For example, mere failure to conduct a trademark search before using a mark may evidence nothing more than carelessness, and so may not warrant an award of fees. Securacomm Consulting, 166 F.3d at 188-89. In combination, the facts above warrant the district court's conclusion that the initial infringement and continuing infringement, even in the face of court orders, was deliberate and willful and that equity required an award of fees.

2.      Amount of the Fees

The district court determined the amount of attorneys' fees under the commonly used lodestar method, in which the number of hours reasonably spent by the attorneys on the case is multiplied by a reasonable hourly rate. Hensley v. Eckerhart,

461 U.S. 424, 433 (1983); <u>Lipsett</u> v. <u>Blanco</u>, 975 F.2d 934, 937 (1st Cir 1992). Tamko submitted a supporting declaration by an experienced trademark attorney. It also submitted detailed time records from lead counsel, house counsel, and local counsel. The court considered the time and labor required, the skill required, the nature and length of the professional relationship with the client, and time limitations imposed by the client. It is clear from the court's October 6, 2000 order that it reviewed the materials in some detail.

Because Ideal did not file any opposition to Tamko's attorneys' fees request and materials, it may well have forfeited this issue for appeal. <u>Hebert</u> v. <u>Wicklund</u>, 744 F.2d 218, 223-24 (1st Cir. 1984). Ideal argues that because the size of the award is substantially larger than the award of profits in this case, an injustice might result if this court does not review the amount of fees. Neither the statute nor the legislative history limits the award of fees to an amount less than the award of profits or damages. To the contrary, the legislative intent was partly to encourage the enforcement of trademark rights in cases where "the measurable damages are

-21-

nominal." S. Rep. 93-1400, reprinted in 1974 U.S.C.C.A.N. 7132, 7136. When a trademark is infringed, trademark owners have more at stake than just the damages or loss of profits in that case. Their failure to enforce their rights may result in the weakening of these rights over time. 2 McCarthy on Trademarks, supra, § 17:17, at 17-31. The cost of enforcing the rights may well be larger than the lost profits in any particular case. In all events, the district court appears carefully to have scrutinized Tamko's filing,[9] and it articulated a clear understanding of the applicable lodestar principles. Given these facts, and given Ideal's failure to furnish the district court with any reasons why Tamko's fee application should have been pared down, we do not think that this is an issue that requires further review.

B. Series    Award to Tamko of Ideal's Profits on the Heritage Products

The district court awarded Tamko Ideal's profits of $201,385.60, a sum calculated on the basis of conservative

---

[9] For example, the court did not initially approve the fees and expenses of Tamko's local counsel because their records were not sufficiently specific about the dates on which services were rendered, and "a number of invoices appear[ed] to reflect that several lawyers performed the same work."

estimates of Ideal's actual profits from the Heritage Series products between November 1997 and February 2000. Ideal argues that no profits should be awarded and the district court committed errors of law; and if any award was justified, this award was too high.

We review de novo the legal standard by which an award of defendant's profits is calculated, and for clear error the factual findings supporting the award.

1.      Standard for an Award of Defendant's Profits

The jury found that Tamko and Ideal were in direct competition. Ideal does not argue that the factual finding was unsupported, but does argue that the district court was nonetheless obligated to inquire further as to the percent of direct market overlap in which such competition took place before it could award an accounting of profits. At most, Ideal says, the two companies competed in 20-30% of their business, so it was error to award 100% of Ideal's profits. Ideal's argument is based on product differentiation. That is, Ideal sold only metal roofing, while Tamko sold only asphalt roofing. Only customers with residential steep-slope roofs would consider

-23-

buying each of the two types of roofing.  Ideal says that only 20% of its sales are in this residential market; its remaining sales are in the commercial and agricultural buildings market, where the products do not compete.

The thrust of the argument is essentially that most of the products Ideal sold under the infringing mark should be considered to be noncompeting products and so it is inequitable to award 100% of the profits to Tamko.  Under circuit precedent, there may be infringement, as well as an accounting of defendant's profits, even when most of the products are not in competition, if there is evidence, as there was here, of likelihood of confusion.  See Baker v. Simmons Co., 325 F.2d 580, 582 (1st Cir. 1963) (affirming an award of defendant's profits based on defendant's gross sales where some of goods sold by defendant did not compete with those sold by plaintiff); Baker v. Simmons Co., 307 F.2d 458, 462-63 (1st Cir. 1962) (affirming infringement finding where plaintiff held the mark Simmons for mattresses and sleep products and defendant used the name Simmonds for reupholstering services).

An accounting of defendant's profits may be awarded in a trademark infringement action "subject to the principles of equity." 15 U.S.C. § 1117(a). Here, Tamko did not seek its actual damages, but did seek an accounting as well as injunctive relief. If injunctive relief provides a complete and adequate remedy, then the equities of the case may not require an accounting of profits. Aktiebolaget Electrolux v. Armatron Int'l, Inc., 999 F.2d 1, 5 (1st Cir. 1993) ("We have found 'a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages.'") (quoting Camel Hair and Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 12 (1st Cir. 1986)). For example, injunctive relief may be adequate if there has been no fraud or palming off and there is little likelihood of actual damage to the plaintiff or profit to the defendant. Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 131 (1947); Valmor Prods. Co. v. Standard Prods. Corp., 464 F.2d 200, 204 (1st Cir. 1972); see generally J. Koelemay Jr., Monetary Relief in Trademark Infringement Cases, in Litigating

Copyright, Trademark and Unfair Competition Cases for the Experienced Practitioner 287, 294 (1997).

Trying to fit itself into these shoes, Ideal suggests that injunctive relief should suffice, as it engaged in neither fraud nor palming off. Ideal's argument is misplaced. The presence of injunctive relief does not preclude an accounting here. There was adequate evidence that Tamko did suffer actual damages and that Ideal did benefit from its infringement. To boot, Ideal's contumacious behavior also raises a question of the adequacy of injunctive relief alone as a remedy.

Repeating its theme that it acted neither fraudulently nor in bad faith, Ideal says that an accounting of profits is unwarranted. Even if we were to accept this theme, it has been this circuit's rule that an accounting of defendant's profits where the products directly compete does not require fraud, bad faith, or palming off. AB Electrolux, 999 F.2d at 5-6. Our rule is thus different from the Restatement rule that an accounting of profits is conditioned on a showing of bad faith. Restatement (Third) of Unfair Competition § 37 cmt. e (1995). Although AB Electrolux was silent on whether "willfulness" is a

precondition for an accounting, the jury here found willfulness,[10] and so we need not reach the issue in this case.[11]

This circuit and others have articulated three justifications for awarding to plaintiff an accounting of the defendant's profits: (1) as a rough measure of the harm to plaintiff; (2) to avoid unjust enrichment of the defendant; or (3) if necessary to protect the plaintiff by deterring a willful infringer from further infringement. Estate of Bishop, 256 F.3d at 1054; Minn. Pet Breeders, Inc. v. Schell & Kampeter, Inc., 41 F.3d 1242, 1247 (8th Cir. 1994); AB Electrolux, 999 F.2d at 5-6; George Brasch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d. Cir. 1992); see generally 5 McCarthy on Trademarks, supra, §§ 30:59, 30:64.

---

[10] As to the meaning of willfulness, the jury was instructed that "[a]n act is done willfully if done voluntarily and intentionally."

[11] Several circuits require a finding of willfulness to support an award of the infringing defendant's profits. See, e.g., Banff, Ltd. v. Colberts, Inc., 996 F.2d 33, 35 (2d Cir. 1993); Frisch's Rests., Inc. v. Elby's Big Boy, 849 F.2d 1012, 1016 (6th Cir. 1988); Reader's Digest Ass'n v. Conservative Digest, Inc., 821 F.2d 800, 807-08 (D.C. Cir. 1987). We agree that when the rationale for an award of defendant's profits is to deter some egregious conduct, willfulness is required. See Securacomm Consulting, 166 F.3d at 190.

Ideal's most cogent argument is that it did not directly compete against Tamko in all the markets in which it profited from use of the mark, and so all of its profits should not go to Tamko.  Ideal points to the articulated justification for the AB Electrolux rule, which is that the defendant acts as a "trustee" of profits that would otherwise belong to plaintiff. 999 F.2d at 5; see also Valmor Prods. Co., 464 F.2d at 204. From this, Ideal argues that AB Electrolux established a "but for" rule: a defendant may be deemed to have acted as "trustee" for the plaintiff's profits, which, but for the infringement, would have been made by plaintiff.  It follows then, Ideal argues, that it cannot be deemed to have acted as "trustee" for the plaintiff's profits as to the 70-80% of the market where, it says, the two companies were not in direct competition; that is, where asphalt roofing and metal roofing did not compete.

We reject any such limitation for an accounting of profits award, once there has been a finding of direct competition, for three reasons, each articulated in the Lanham Act, 15 U.S.C. § 1117(a).  First, the limitation misplaces the burdens, in assuming plaintiffs must meet such a test as to

-28-

remedy, once infringement and direct competition are established. The burden of showing that not all profits should be awarded is more akin to the burden of showing the amount of costs to be deducted from profits, which the Act places on defendant. Second, such a test ignores the three rationales for the remedy of accounting of profits. Third, the test is inconsistent with the inherent equitable power of the district court and the Lanham Act's designation of an accounting of defendant's profits as an equitable remedy.

First, we think once plaintiff has shown direct competition and infringement, the statute places the burden on the infringer to show the limits of the direct competition: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Even before the Lanham Act, the Supreme Court had squarely placed the burden on the infringer "to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark." Mishawaka Rubber & Woolen

Mfg. Co. v. S.S. Kresge Co., 316 U.S. 203, 206-07 (1942); see also 5 McCarthy on Trademarks, supra, § 30:65, at 30-128 ("Under the federal Lanham Act, as well as the common law, it is the infringer's burden to prove any proportion of his total profits which may not have been due to his use of the infringing mark."); Koelemay, supra, at 322-23 ("The burden of apportionment [of profits resulting directly from infringement and those not], however, is on the infringer."). Here, the plaintiff proved the amount of defendant's sales; we consider the defense of only partial direct competition to be very similar to an element of cost or deduction claimed, which defendant has the burden of showing. At trial, Ideal did not ask for a jury finding on the percentage of market overlap. Nor did it present the issue and evidence to the trial judge when he requested briefing from both parties on the accounting of profits. The trial judge was under no obligation to raise or resolve the issue sua sponte. In fact, Tamko disputes Ideal's assertions made on appeal about the percentage of direct competition in the market, and says there was 100% overlap. The place for resolution of this issue was the trial court.

Second, even ignoring momentarily Ideal's waiver at the district court level, the argument is inconsistent with the first rationale for providing an accounting of profits -- recompense to plaintiff for the harms it has suffered. Congress recognized that the defendant's profits may be an inexact proxy for the detriment suffered by plaintiffs. Toward this end, the Act also provides:

> If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in . . . the above circumstances shall constitute compensation and not a penalty.

15 U.S.C. § 1117(a). Here, Ideal provided little basis for the district court to conclude that an award of all of defendant's profits was excessive. In addition to its own loss of profits, a plaintiff may, for example, suffer harm to the goodwill associated with its mark. But beyond that, the district court, so long as the sum awarded was not a penalty, was entitled to consider two other policy objectives once it found that defendant's conduct was inequitable: awarding defendant's profits based on unjust enrichment to the defendant, or based on

-31-

a deterrence theory.  AB Electrolux, 999 F.2d at 5 ("[W]here defendant's inequitable conduct warrants bypassing the usual rule of actual harm, damages may be assessed on an unjust enrichment or deterrence theory.").

Even assuming that Tamko and Ideal directly compete as to only a portion of Ideal's sales, and even if we were to give Ideal the benefit of plain error review, we could not say that there was an abuse of discretion in awarding defendant's profits in order to avoid unjust enrichment where the infringement was willful.  The award itself was conservative.  Further, the evidence is that the infringement was willful, intended to divert customers from Tamko, and, importantly, to trade on the goodwill Tamko had established, nurtured, and assiduously guarded in its Heritage mark.  There was also evidence of customer confusion.  Thus, even in the absence of palming off, it is reasonable to conclude that Ideal was unjustly enriched by trading on Tamko's goodwill beyond the two companies' areas of direct competition.

In cases of at least some direct competition and willfulness, some role may exist for deterrence in an award of

an accounting of profits.  The role of deterrence must be carefully weighed in light of the statutory prohibition on the imposition of penalties.  15 U.S.C. § 1117(a) ("Such sum . . . shall constitute compensation and not a penalty."); Koelemay, supra, at 307; see also ALPO Petfoods, Inc. v. Ralston Purina Co., 913 F.2d 958, 969 (D.C. Cir. 1990) (criticizing deterrence rationale).  In an analogous case, one circuit revised an award of 20% of defendant's profits and directed an award of 100% of the profits because it believed that 20% was "clearly inadequate to ensure that similar conduct will not reoccur in the future." Truck Equip. Serv. Co. v. Fruehauf Corp., 536 F.2d 1210, 1223 (8th Cir. 1976).  The rule that where there is willful infringement, an accounting of profits is not necessarily restricted to the particular area of direct competition is reinforced by the intention of the Lanham Act to provide nationwide protection of a mark, in contrast to the more limited geographic protection afforded by the common law.  See Minn. Pet Breeders, 41 F.3d at 1246.  Tamko had an unusually strong interest in deterrence, given Ideal's track record, and it would not be an abuse of discretion to conclude that the accounting of

profits should reflect some recognition of that interest. Nonetheless, the deterrence rationale is primarily served by the attorneys' fees award, and should not be the primary reason for an accounting of profits. Koelemay, supra, at 308.

Our third reason for rejecting Ideal's limitation on profits awards is that it is inconsistent with the equitable nature of the court's remedial power. It may well be equitable for a court to include in the damages calculation an award of less than the defendant's complete profits in light of less than complete direct competition. See, e.g., Truck Equip. Serv. Co., 536 F.2d at 1221-22 (awarding defendant's profits only from geographical areas where parties directly competed). On other facts it may be inequitable to give defendants such a benefit. Mechanical rules are of little aid in this analysis.

Equity must take account of the purposes served by the Lanham Act:

> One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time, and money in presenting to the public the product, he is protected in his investment from its misappropriation by pirates and cheats.

-34-

S. Rep. No. 1333 (1946), reprinted in 1946 U.S.C.C.S. 1274, 1274. As another circuit cogently observed in a case raising the issue of less than 100% competition, either through product differentiation or geographical separation: "We think it doubtful whether even the second of these purposes, protection of the trademark owner, is adequately served by a rule which would allow accountings only where the parties directly compete." Monsanto Chem. Co. v. Perfect Fit Prods. Mfg. Co., 349 F.2d 389, 395 (2d Cir. 1965); see also Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582, 585 (5th Cir. 1980) (holding that a "diversion of sales," or direct competition, is not necessary for an award of profits because of the need to protect a trademark as a property right).

The award of Ideal's entire profits was correct.

2. Amount of Award

This still leaves Ideal's attack on the amount of the profits award. This attack is also without merit. The calculation of the award is up to the trial court's discretion, and we will not disturb it unless it rests on clearly erroneous

findings of fact, incorrect legal standards, or a meaningful error in judgment.

The court awarded Tamko $201,385.60 as Ideal's profits from the sales of its Heritage Series products. To calculate this amount, the court accepted the $449,522 figure for Ideal's sales of the Heritage Series product in the United States between January 1, 1998 and January 31, 2000, which was provided by René Laplante (Ideal's Vice President) in response to an interrogatory. The court prorated this amount "to account for sales made in November and December of 1997 and February 2000" to arrive at $503,464. The court then subtracted 60% from that amount because "LaPlante previously testified that Ideal's profit margin on sales of its 'Heritage Series' product [was] 40%." Thus, the court arrived at its final figure.

Ideal argues that the court used the wrong numbers for the amount of the costs. The defendant has the burden of producing evidence as to its costs. 15 U.S.C. § 1117(a). Ideal only provided the district court with a conclusory earnings statement which included a number for costs. The court decided that this statement was unreliable without supporting documentation. Instead, it relied on a statement made by Ideal at trial as to its profit margin on the Heritage Series

products.  This was not an abuse of discretion, and the amount of the accounting award is affirmed.

C.        Denial of the Motion for Mistrial

Upon redirect examination of Ideal's vice president, Tamko introduced some evidence concerning the existence of the preliminary injunction and of the magistrate judge's conclusion that Ideal failed to comply with the preliminary injunction. Ideal moved for a mistrial.  The basis for the motion was that the trial judge erred in admitting the evidence, causing irreparable prejudice to Ideal.  The court denied the motion.

Because the mistrial motion was premised on the district court's admission of evidence, Ideal bears an unusually heavy appellate burden: a double burden of showing abuse of discretion, both as to the admission of evidence and as to the denial of the mistrial.  <u>United States</u> v. <u>Arias-Santana</u>, 964 F.2d 1262, 1265 (1st Cir. 1992) ("We normally review the denial of a request for the exclusion of evidence, or a motion for mistrial, under the same 'abuse of discretion' standard.").

There was no abuse in the admission of the evidence, and consequently could be no abuse in the denial of the

mistrial. Initially, when Ideal moved in limine before the trial to exclude any mention of the preliminary injunction and the contempt order, the parties reached an agreement to a stipulated jury instruction, described earlier. The parties also agreed that they would not introduce evidence of the contempt order. However, during the cross-examination of René Laplante (Ideal's Vice President), Ideal's lawyer asked about the preliminary injunction and whether it referred to the web site. Then, on redirect, Tamko's lawyer asked about the court's contempt order and some of its contents.

In response to Ideal's objection to the testimony about the contempt order, the district judge stated that Ideal's lawyer had opened the door to this testimony by asking about the injunction and Ideal's compliance with it on cross-examination. The next day, when Ideal moved for mistrial based on the admission of the evidence of the contempt order, the judge repeated his finding that Ideal had opened the door, and said "it's unfortunate, but we will do everything reasonable to minimize any problems from it." The judge then suggested a curative instruction that would tell the jury "that they can use

the evidence that they have received and focus as they should solely on the issue of willfulness.  It has no relevance to the other issues in this case."  During the jury instructions, the court instructed the jury "to disregard all evidence relating to the February 29, 2000, [preliminary injunction] order.  Such evidence is not to be considered by you in any way in deciding any issue in this case."

In sum, the district court was admirably sensitive to the problem of potential prejudice to Ideal and set up ground rules to avoid the problem.  Ideal transgressed those rules and tried to give the impression that it had complied with the injunction.  In this it went too far and its own examination of Laplante opened the door.  Nevertheless, the district court continued to be sympathetic to the potential problems with the admission of the evidence and gave a strong curative instruction to the jury.  See United States v. Chamorro, 687 F.2d 1, 6 (1st Cir. 1982) (cautionary jury instructions dispelled any significant risk of unfair prejudice). Admission and exclusion of evidence, as well as the necessity (if any) for a mistrial is

committed to the sound discretion of the district court and we see no error, much less an abuse of discretion.

D.      The Permanent Injunction Against Ideal's Use of "H-Series"

The district court issued a permanent injunction against Ideal on August 30, 2000, barring Ideal "from using the term Heritage, Heritage Series, H Series, or any name or mark confusingly similar to Heritage in connection with the sale, offer to sell, promotion, marketing, or advertising of any roofing product or service in the United States."

Ideal argues that the injunction is overbroad in barring use of "H-Series" by Ideal, because H-Series is not one of Tamko's registered trademarks. "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs," Califano v. Yamaski, 442 U.S. 682, 702 (1979), and courts must "closely tailor injunctions to the harm that they address," ALPO Petfoods, 913 F.2d at 972. While generally the issuance of injunctive relief is reviewed for abuse of discretion, we review underlying factual determinations for clear error. I.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998).

On different facts, we might have more sympathy for a claim that an injunction against the use of a mark not registered to plaintiff is overbroad. Not here. This case is a perfect example of the need for the "safe distance rule," which counsels that "an infringer, once caught, must expect some fencing in. . . . Thus, a court can frame an injunction which will keep a proven infringer safely away from the perimeter of future infringement." 5 McCarthy on Trademarks, supra, § 30:4, at 30-12. Indeed, it was after Ideal faced contempt charges that it came up with "H-Series," effectively dropping the "eritage" of "Heritage Series." The district court, during the contempt proceedings, heard evidence that Ideal's use of "H-Series" would cause confusion: Tamko representatives and their customers used "H" as an abbreviated reference for Tamko Heritage products, and Tamko's "Heritage 25" product is often referred to as H25. Cf. Forum Corp. of N. Am. v. Forum, Ltd., 903 F.2d 434, 441 (7th Cir. 1990); Syrelec v. Pass & Seymour, Inc., 869 F.2d 838, 839 (5th Cir. 1989); Purolator, Inc. v. EFRA Distribs., Inc., 687 F.2d 554, 560 (1st Cir. 1982). There are circumstances in which abbreviations of trademarks may be

protectable as independent marks.  See 1 <u>McCarthy on Trademarks</u>,

<u>supra</u>, § 7:18, at 7-48.  Whether or not that is the case here,

the evidence that Ideal's use of "H-Series" would cause

confusion is sufficient to justify the injunction requiring

Ideal to steer clear of this similar abbreviation of the mark.

### III.

Although Ideal's counsel on appeal have striven

mightily, the trial record dooms the appeal.  The judgment is

<u>affirmed</u>.  Costs are awarded to Tamko.